Filed 10/4/13  Pena v. Central Freight Lines CA

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOUISE PENA,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CENTRAL FREIGHT LINES, INC.,<br><br>        Defendant and Appellant. | A134753, A138014<br><br>(Alameda County<br>Super. Ct. No. RG 09448335) |

Louise Pena was fired from her job at Central Freight Lines, Inc. (Central) after she returned from a two-week medical leave.  She sued Central under the Fair Housing and Employment Act (Gov. Code, § 12900 et seq. (FEHA))[1], and in a non-jury trial, prevailed on all of her causes of action.  The court awarded Pena $470,000 in economic and noneconomic damages and $431,884.25 in attorneys' fees.

In two appeals, which we order consolidated, Central raises numerous challenges to both the judgment and the fee award.  None are meritorious, so we affirm.

**BACKGROUND**

"In general, in reviewing a judgment based upon a statement of decision following a bench trial, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. . . . In a substantial evidence challenge to a judgment, the appellate court will consider all of the evidence in the light most favorable to the prevailing party, giving it

---

[1] Further statutory citations are to the Government Code.

1

the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. . . . We may not reweigh the evidence and are bound by the trial court's credibility determinations. . . . Moreover, findings of fact are liberally construed to support the judgment." (*Jeffrey Kavin, Inc. v. Frye* (2012) 204 Cal.App.4th 35, 43, citations and internal quotation marks omitted.)

This trial encompassed four full days of testimony, eight witnesses, and extensive documentary evidence and argument by counsel. At the end, after issuing a tentative judgment and considering Central's objections to Pena's proposed statement of decision, the court issued a 20-page statement of decision that provided a detailed exposition of its analysis and conclusions.[2] Because the focal point of this appeal and our analysis is the trial court's statement of decision, we will quote the relevant portions of the court's factual discussion and findings at length.

"The Court finds that in April 2004, Plaintiff Louise Pena, at age 35, was hired by Defendant Central at its Hayward, California terminal. Pena's job was a customer service representative. In late February[] 2008, Defendant Central hired a new terminal manager, Aaron Holstein, at its Hayward Facility.

"Central's employee handbook states that Central has a policy of progressive discipline in matters of attendance. The handbook further states that before an employee

---

[2] Central asserts that the trial court did not "acknowledge, reply to or even attempt to refute" Central's response to Pena's proposed statement of the decision, which the trial court essentially adopted. But, tucked away in a footnote, Central concedes that the court *issued a written reply to Central's response*. Central says this reply was too short, did not deal with the issues raised in its response, and "merely cites cases stating the truism that a Statement of Decision need not be a wholesale brief." But Central chose not to include the court's reply in its designation of the record on appeal. "A fundamental principle of appellate practice is that an appellant ' "must affirmatively show error by an adequate record. . . . Error is never presumed. . . . A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent. . . ." ' " (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532.) Accordingly, we presume the trial court dealt appropriately with Central's response to the proposed statement of decision.

may be terminated regarding attendance or absences from work, the employee will be given verbal counseling for two accumulated occurrences, then a written warning for three accumulated occurrences and a final written warning for four accumulated occurrences and discharge from employment for five accumulated occurrences (exhibit 20). The Court finds Pena was never given oral counseling or written warnings regarding her attendance as required by Central's progressive discipline system.

"On March 14, 2008, three weeks after the hiring of Holstein as the terminal manager for Central, Pena[] was injured in an automobile incident on her way to work. At approximately 5:30 am on highway 80 a large metal bar crashed through the windshield of her car barely missing her head, smashed the rear window and landed in the back seat. While waiting for family to come to the scene she notified Holstein that she had been injured in an accident and could not come to work that day. Later that day Pena called Holstein and notified him that she had hurt her back and neck and was in pain. Holstein asked her to keep Central informed as to her medical condition and when she would be returning to work.

"On Sunday March 16, 2008, Pena went to the emergency room at Sutter Solano Medical Center. The emergency room physician diagnosed back and neck strain and headaches. The emergency room physician instructed Pena to make an appointment with her doctor.

"On Monday, March 17, 2008 Pena notified her employer that she was still injured and needed medical care and that she was unable to come to work. Holstein had no objections and told her to keep him informed. The Court finds that Pena's notification to Holstein was a request for a medical leave of absence. [¶] . . . [¶]

"The Court finds Pena scheduled an appointment to see her doctor at Associated Family Physicians in Vallejo on Thursday, March 20, 2008. The doctor reported that Plaintiff had symptoms of acute anxiety, nightmares and hallucinations, depression, sleep disorder, headaches and back pain. The doctor attributed all of her symptoms to the March 14, 2008, automobile accident.

3

"On Thursday, March 20, 2008, the doctor gave Pena written certification that she was unable to work from March 14, 2008 through March 24, 2008. On the same day, Pena notified Holstein of the above symptoms and impairments and told Holstein that she had written certification from her doctor that she could not come to work until Tuesday, March 25, 2008. Her employer raised no objections and requested that she keep them informed.

"On Sunday, March 23, 2008 Pena went back to the Sutter/Solano Medical Center Emergency room. The emergency room doctor diagnosed migraine headaches. Her physician extended her time off from work an additional three days from March 24, 2008 through March 27, 2008.

"On Tuesday, March 25, 2008, Pena notified Holstein by telephone that the emergency room doctor had extended her time off from work three more days from March 25 to March 27, 2008. Pena informed Holstein that she was suffering from migraine headaches, sleeplessness and anxiety, and that the doctor had given her a written certification that she was unable to work. Pena informed Holstein that she expected to return to work on Friday, March 28, 2008. Holstein told Pena to bring her doctors' notes when she returned to work and they could then do the paper work at that time.

"The Court finds that through all the communications Plaintiff had with Defendant regarding her medical condition and need for treatment, Defendant knew or should have known and understood that Plaintiff had a serious health condition that entitled her to medical disability leave under the California Family Rights Act (CFRA) and Defendant knew or should have known that Pena was entitled to a reasonable accommodation under the Fair Employment and Housing Act (FEHA).

"Following Pena's telephone conversation with Holstein on Tuesday, March 25, 2008, Holstein recommended in a memorandum to his supervisors, that Pena be terminated (exhibit 25). This memorandum also states that Pena was experiencing migraine headaches and her doctor had taken her off work. Holstein's memorandum

4

indicates his dissatisfaction with her attendance, specifically mentioning March 14, 17 and 25, 2008 (protected leave dates).

"Further, on Friday, March 28, 2008, Pena returned to the Associated Family Physicians to see her doctor. The nurse practitioner at Associated Family Physicians certified in writing that Pena was unable to work through March 31, 2008. Pena notified Holstein that her doctor had taken her off work through March 31, 2008, and that she intended to return to work on April 1, 2008.

"The Court finds that on March 28, 2008 Holstein and Central's Human Resources Department executed Pena's Notice of Separation. The Separation Notice contained 21 possible categories for termination including such categories as poor work performance, not able to perform job duties, inappropriate work place conduct, lay-off and other categories. On the first Separation Notice (exhibit 2) the Defendant marked the category 'absenteeism' as the reason for Pena's termination. No other category was marked. The Separation Notice indicated that the date of Pena's separation from her employment was April 1, 2008.

"On Monday, April 1, 2008, Pena returned to work without any limitations or restrictions and able to perform all the essential functions of her job. She brought with her written medical certifications confirming that she had been totally unable to work from March 14 to March 31, and that she had been under the doctor's professional care (exhibits 37-39). Pena also brought the traffic accident report of March 14, 2008 (exhibit 36). She gave the certifications and the traffic accident report to Holstein. Holstein suspended her and sent her home and told her to call in every day to determine whether there was work for her, even though Holstein knew that he would not be offering Pena any work. The Court finds there was plenty of work to do in the customer service department at that time.

"On April 2, 2008 Central prepared a second Notice of Separation (exhibit 23). This notice was prepared after Central had received the written medical certifications and the traffic collision report. A second Notice of Separation was executed on April 2, 2008

5

by Holstein and the Human Resource Department. The separation notice indicated the reason for termination 'absenteeism' and stated the termination date to be April 4, 2008.

"On April 8, 2008 the terminal manager telephoned Pena requesting that she come to the Hayward facility from her home in American Canyon. The terminal manager Holstein told Pena that her attendance was in the garbage and that she was being terminated. Pena told Holstein that she did not want to be terminated because she had a disabled husband and three dependent children to support. [¶] . . . [¶]

"On June 20, 2008, (exhibit 35) in a letter response to a Department of Fair Employment and Housing questionnaire, Central's vice-president of Human Resource and Risk Management, William Wilson, stated Pena met the requirements of the customer service clerk position and that Central did not terminate Pena as a result of her abilities as a customer service clerk. Mr. Wilson further stated that Central terminated Pena due to her poor attendance.

"On October 12, 2009, William Wilson testified in deposition that 'the only reason for Ms. Pena's termination was her lack of attendance at work.' He also testified that he did not terminate her as a result of her abilities as a customer service clerk (exhibit 33).

"The court finds the only reason for Pena's termination was her absence from work during the period March 14, 2008 to March 31, 2008, when Pena was disabled and unable to work. The Court finds that Central began the process of Pena's termination on March 25, 2008. The court finds that at the time Central made its decision to terminate Pena, Central knew or should have known that Pena was disabled and unable to work. The court finds Pena's absences during this period of time were protected and not to be used as a reason for termination.

"The Court finds that Central included protected dates of absences in determining the points or occurrences that Central used in its decision to terminate Pena (exhibit 16, employee data calendar). Mr. Wilson's response letter to the FEHA investigation provided that Pena missed work without approval on January 21, February 25 and March 14 through April 1, 2008 for a total of 14 days of unexcused absences. Mr. Wilson's letter states that Pena missed work on March 14, 2008 due to a car accident, missed work

6

the week of March 17, 2008 due to lack of sleep, and missed work the week of March 24, 2008 due to migraines. The letter further states that when she returned to work on April 1, 2008 she provided a doctor's certifications. In Wilson's response to charge III of the FEHA investigation, Wilson stated the only reason for Pena's termination was her lack of attendance at work.

"The court further finds that Holstein's testimony that Pena was terminated for reasons other than her absences from work during the period March 14, 2008 to March 31, 2008 lacks credibility. Holstein claimed that one of the main reasons for Pena's termination was that she had at least 10 to 12 unauthorized absences in 2007. When Holstein was cross-examined on Pena's attendance records for 2007 he could only identify one possible unauthorized absence. Holstein testified that he saw Pena's unauthorized absences on a computer screen and that he took notes regarding the dates of the absences. Holstein could not produce the notes and they were not in Pena's personnel file. Holstein also testified that he had written up Pena for an unauthorized absence in 2008 and had placed the write up in her personnel file. Central could not produce this document at trial. Holstein could not explain the discrepancy between the attendance records and his recollection of what he viewed on the computer screen regarding Pena's attendance in 2007. Holstein also could not explain why his notes regarding Pena's absences which he personally copied from the computer had disappeared. The court finds that Holstein['s] entire testimony lacks credibility. The court finds Central failed to produce any credible evidence that any of Pena's absences were unauthorized.

"The court finds that Pena was not terminated because of work performance, attitude or that she wanted to be fired in order to collect unemployment benefits. Pena was the sole bread winner for her family which included a disabled husband and three dependent minor children. She told Holstein that she needed her job and did not want to be fired. Nonetheless, Holstein disregarded what she said and unreasonably chose, under the circumstances, to believe rumors and hearsay. The court finds it improbable under the circumstances that Pena wanted to be fired. As the Terminal Manager and supervisor, the court finds it troubling that Holstein was not more objective and in addition to not

7

really accepting the fact that Pena's time off was the result of a medical disability flowing from the motor vehicle accident she suffered. Holstein also chose to not believe what Pena told him and instead relied on hearsay information which he used against Pena in reporting the hearsay to his superiors along with a distortion and omission of facts regarding the time she was off. Also troubling is the fact that Central used this information and distorted the facts of Pena's medical leave in an attempt to prevent her from receiving unemployment insurance benefits after being terminated.

"The Court finds that Central's alleged reason for termination that Central was downsizing also lacks credibility. Central hired another customer service representative shortly after Pena's termination. Two current employees of Central testified that it took two persons to replace Pena. There was testimony that she was the go to person at work with the most knowledge and skill of all the employees and that she had a good attitude and was well liked. The Court finds that there is overwhelming evidence that the Defendant's purported reasons for terminating plaintiff lack[] credibility and are without merit.

"The Court finds Pena was not terminated because she was an at-will employee, nor because of her absences in 2007 or her absences before March 14, 2008, nor because of her work performance, attitude, business necessity or worsening economy. The Court also finds that undue hardship was not a reason for Central to fail to return Plaintiff to her job after her disability ended.

"The Court finds that Pena was terminated for taking a 'protected leave of absence' as evidenced by the March 25, 2008, written memorandum from Aaron Holstein[] to Central's Department of Human Resources. The memorandum indicates Defendant began the termination process for plaintiff even though Plaintiff told him that she was suffering from migraine headaches and had sleeping issues at that time. Holstein's memorandum states that Plaintiff's absence from work during her protected medical leave of absence (March 14, 2008 to March 31, 2008) was part of a pattern of absenteeism.

8

"Also, exhibit 16, Defendant's employee data calendar for 2008 for the Plaintiff, provides the Defendant's basis for plaintiff's termination. The court finds the Defendant included protected leave days (March 14 and March 17, 2008) as the basis for Plaintiff's termination.

"The Court finds the sole reason provided by terminal manager, Aaron Holstein in Defendant's March 28, 2008 separation notice for Plaintiff's termination was absenteeism. This reason is consistent with Mr. Wilson's (head of human resources) June 20, 2008 written response to the investigation by FEHA that the only reason for Ms. Pena's termination was her lack of attendance at work. In Mr. Wilson's response to the FEHA investigation he includes absences within the protected period, March 14 to April 1, 2008 as the reason for her termination."

The court found for Pena on each of her five causes of action under FEHA: retaliation, failure to provide a reasonable accommodation, failure to engage in a good faith interactive process to determine a reasonable accommodation, disability discrimination, and denial of medical leave in violation of the California Family Rights Act (§ 12945.1 et seq. (CFRA)). The court awarded Pena $94,000 for lost earnings and medical benefits and $376,000 for emotional distress, plus costs and interest. Central appealed from the judgment and postjudgment order awarding Pena attorneys' fees.

## DISCUSSION

### *I. Central's Claims Of Legal Error Are Meritless*

Central raises a host of legal challenges to the judgment. All of them either lack merit or are based on misrepresentations of the record. Central's initial contention fails in both categories. It asserts that all five of Pena's causes of action are encompassed by, and somehow collapse into, her wrongful termination claim under CFRA, resulting in a judgment that is effectively based on only one "primary right." Therefore, Central concludes, Pena is not entitled to duplicative damages on her other causes of action. Central's argument is at best obscure, but we need not attempt to untangle it because Pena was not, as Central implies, awarded duplicative damages. Therefore, as far as we

9

can determine, the argument is simply irrelevant to any issue actually presented for our consideration.

Central then proceeds to mischaracterize key portions of the trial court's statement of decision. It claims the court misinterpreted FEHA so as to impose liability on Central for firing Pena for reasons that the court subjectively believed to be unfair, although not discriminatory. It similarly contends the court "did not take into consideration" the possibility that Holstein's decision to fire Pena was misguided or mistaken, but not discriminatory, and therefore, not actionable. Neither claim has a shred of support in the record. To the contrary, the court expressly found that Central terminated Pena for taking a protected leave of absence and in retaliation for her disability. While an employer may fire an employee for a good reason, a bad reason, or for no reason at all, it may not fire the employee for reasons that violate FEHA. (See, e.g., *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344.) The court neither misinterpreted nor misapplied FEHA.

In a related vein, Central contends the court "disregarded" its "mixed motive" defense that showed it would have fired Pena for legitimate reasons even had her protected disability leave not figured into its decision to terminate her. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203; *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748.) Central has not provided record citations showing that it asserted such a defense at trial, something that is by no means obvious from our review of the record. In any event, Central's contention is meritless. The court found "overwhelming evidence" that Central fired Pena for taking a protected disability leave and that its purported valid reasons for terminating her were false. The court expressly found Pena "was not terminated because she was an at-will employee, nor because of her absences in 2007 or her absences before March 14, 2008, nor because of her work performance, attitude, business necessity or worsening economy." If Central did in fact present a mixed motive defense, then, it is abundantly clear that the court rejected it.

Central next contends Pena's inability to work from March 14 through March 31 bars her claims for disability discrimination, failure to engage in the interactive process, and failure to accommodate her disability as a matter of law. The argument, as we

10

understand it, runs like this. It is undisputed that Pena was unable to perform any of her job functions from March 14 through 31, with or without reasonable accommodation, so Central had no duty to engage in the futile exercise of seeking a reasonable accommodation for her disability. Then, when Pena returned to work on April 1 she was no longer disabled, so Central had the unqualified right to terminate her employment.

This argument is specious. As to its first prong, Pena's failure-to-accommodate claims[3] were premised, not on a theory that Central failed to modify Pena's duties during or after her disability leave, but on Central's failure to hold her position open and reinstate her upon her return from medical leave. (See, e.g., *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193–1194 [" 'reasonable accommodation can include providing the employee accrued paid leave or additional unpaid leave for treatment . . .' provided it is likely that, at the end of such leave, the employee will be able to perform his or her employment duties."]; *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226.) Therefore, the possible irrelevance of other potential accommodations has no bearing on Central's liability. As to Central's second point, it did *not* have the right, on April 1 or at any time, to terminate Pena because she took a protected medical leave. "[I]t shall be an unlawful employment practice for any employer . . . to refuse to grant a request by any [qualified] employee . . . to take up to a total of 12 workweeks in any 12-month period for family care and medical leave. *Family care and medical leave requested pursuant to this subdivision shall not be deemed to have been granted unless the employer provides the employee, upon granting the leave request, a guarantee of employment in the same or a comparable position upon the termination of the leave.*" (§ 12945.2, subd. (a), italics added.)

Central further asserts the trial court improperly allowed Rhoma Young to testify as an expert in human resources matters, and then "expressly abdicated to Ms. Young" the crucial determination of whether Pena's termination was legal. Both assertions are

_____

[3] We use the term "failure-to-accommodate claims" as shorthand to refer both to failure to accommodate and failure to engage in a good faith interactive process to reach an accommodation.

11

meritless. Central touched on the issue of the relevancy of Young's testimony during her voir dire and in colloquy with the court, but at no point did its counsel object to the admission of her expert testimony so as to preserve the issue for appeal. [4] Accordingly, Central is barred from raising the claim in this court. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353.) But even had an adequate objection been made, Central's contention fails.

Expert testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and based on information or knowledge "of a type that reasonably may be relied upon by an expert in forming an opinion. . . ." (Evid. Code, § 801, subds. (a) & (b).) " 'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications.' [Citation.] '[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the [fact finder] in the search for truth.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.) A trial court's decision to admit expert testimony "will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People v. Kelly* (1976) 17 Cal.3d 24, 39.)

Here, Young's academic and professional qualifications in the field of human relations were not seriously disputed. Her testimony was proffered on whether Central followed reasonable industry practices or procedures in handling Pena's leave and termination, whether Pena undertook appropriate actions to mitigate her damages, and the value of her employment benefits. Central's argument is focused on the first of these points. It asserts there is no such thing as a human relations "industry," so Young is not

---

[4] Central says its counsel objected to Young's testimony "[b]efore she was subjected to any questioning," but neither the specific pages it cites for that claim nor the rest of Young's testimony evidences such an objection.

12

really an expert in anything. But, if she is an expert, the experience and information she relied on are too ill-defined, vague, or informal to support expert opinion.

The trial court reasonably disagreed. Young testified to her extensive history working for major employers and in her own private consulting practice in areas that included labor relations, contract administration and negotiation, affirmative action plans, the development of management policy in the area of equal employment and stability, and the handling, investigation and resolution of complaints. One of her focuses is on preventing discrimination through the analysis and development of policies and procedures for all stages of employee management. She is active in local and national professional organizations for human resources managers. She teaches human resources professionals at U.C. Berkeley, San Francisco State and Mills College. She has testified before Congress on behalf of the Society of Human Resources Management. She works with agencies that are responsible for developing guidelines to assist employers in complying with laws such as the Americans with Disabilities Act and the Family Medical Leave Act. Plainly, then, the trial court reasonably qualified Young as an expert witness about industry guidelines, practices and procedures based on her extensive experience in and knowledge of the field. It was then up to the court, as it correctly noted, to assess the relevance and value of her testimony. There was no abuse of discretion.

## II. *Ample Evidence Supports The Judgment*

Central's argument that the judgment is not supported by substantial evidence is premised almost entirely on its view that the trial court was wrong to discredit Holstein's testimony. Nonsense. "It is the exclusive function of the trial court to weigh the evidence, resolve conflicts and determine the credibility of witnesses [citation] and if its interpretation . . . is reasonable, a reviewing court will not disturb the trial court's determination in the matter unless an abuse of discretion is clearly shown [citation]." (*Estate of Desmond* (1963) 223 Cal.App.2d 211, 215.) Central makes no case that would lead us to question the trial court's rejection of Holstein's version of events, particularly in light of documentary evidence that contradicted substantial portions of his direct

testimony.  The trial court did not abuse its discretion when it determined Holstein was not credible.

### III. Damages

### Background

Based on testimony from Pena, two of her children, her sister, and psychiatrist Phillip Grob, the court found "overwhelmingly clear and convincing" evidence that Pena suffered "severe emotional distress including loss of enjoyment of life, grief, anxiety, humiliation and depression which negatively impacted the vitality of her relationships with her immediate and extended family, as well as impacted her mental and physical health and self-esteem" due to Central's wrongful actions.  The court further found that after she was terminated, Pena suffered extreme financial hardship.  She was forced to go to the food bank for food for her family, lost her and her family's medical benefits, fell behind on her mortgage and went into foreclosure.  All of this further eroded her self-esteem and added to her depression, anxiety and humiliation, while her loss of medical benefits prevented her from seeking psychological help for her mental distress.  The court awarded Pena $376,000 for her emotional distress.

### Discussion

Although Central concedes that FEHA authorizes damages for emotional distress, it raises numerous arguments against the award here.  We may dispense quickly with its claim that emotional distress damages were unavailable because Pena's claim was merely for breach of an implied employment contract, and "[a] pre-existing contractual relationship, without more, will not support a recovery for mental suffering . . . ."  Pena alleged and proved multiple claims under FEHA.  Central's mischaracterization of them does not change that.

Central's claim that emotional distress damages arising from job loss are barred by the exclusive remedy provisions of the workers' compensation law is correct as a general matter, but wrong in this case.  "Emotional distress caused by misconduct in employment relations involving, for example, promotions, demotions, criticism of work practices, negotiations as to grievances, is a normal part of the employment environment.  A cause

14

of action for such a claim is barred by the exclusive remedy provisions of the workers' compensation law. [Citations.] The Legislature, however, did not intend that an employer be allowed to raise the exclusivity rule for the purpose of deflecting a claim of discriminatory practices. [Citations.] [¶] Thus, a claim for emotional and psychological damage, arising out of employment, is not barred where the distress is engendered by an employer's illegal discriminatory practices." (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 352, disapproved on other grounds in *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 816–823; accord, *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 288.)

In what is largely a rehash of its arguments at trial, Central next attacks the sufficiency of the evidence supporting the emotional distress damages award. Central challenges Dr. Grob's expert psychiatric testimony as lacking a proper factual or scientific basis because it was based on one interview held long after Pena's termination. It also stresses that Pena did not seek medical attention, was not prescribed medication, and was not hospitalized. And, it asserts that her distress was mere annoyance because "Pena's family stayed together" despite her termination, and with income from the new, lower-paying job she eventually landed and her unemployment compensation, "destitution was not a concern." But the court drew different conclusions from the evidence, and Central failed to move for a new trial to challenge its assessment. Central's failure precludes appellate review. "A failure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or by the court. [Citation.] The power to weigh the evidence and resolve issues of credibility is vested in the trial court, not the reviewing court. [Citation.] Thus, a party who first challenges the damage award on appeal, without a motion for a new trial, unnecessarily burdens the appellate court with issues that can and should be resolved at the trial level. [Citation.] Consequently, if ascertainment of the amount of damages turns on the credibility of witnesses, conflicting evidence, or other factual questions, the award may not be

15

challenged for inadequacy or excessiveness for the first time on appeal." (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719–720.)

## *IV. Attorneys' Fees*

The trial court awarded Pena attorneys' fees under FEHA. (See § 12965, subd. (b) ["In civil actions brought under this section, the court, in its discretion, may award to the prevailing party . . . reasonable attorney's fees and costs, including expert witness fees"].) Central argued that Pena was not entitled to fees because she prevailed only on a *tort* claim for wrongful termination, but, as the court correctly observed, Pena recovered damages for FEHA violations, not common law wrongful termination. Central tries to resuscitate this odd argument on appeal, but it lacks merit here just as in the trial court.

Central also challenges the amount of the fee award. Pena sought $789,125 in attorneys' fees, which included a 2.5 multiplier. The trial court awarded the lodestar fees sought, but reduced the multiplier to 1.33. It explained: "The court has considered the matters involved in this case, their nature and level of complexity, the conduct of the parties and their counsel that may have led to increased expenditure of time and effort, the evidence submitted, and the record on this matter. Based upon the foregoing, and the court's experience as an attorney and judge, and good cause appearing, the court concludes that the reasonable amount of attorneys' fees is $431,884.25, including but not limited to fees for work related to pre-filing investigation, work on Defendant's motion for summary judgment, trial preparation, trial, and work done on this motion."

The court expressly found that both the rates and the number of hours billed by counsel were reasonable. Central challenges only the second of these findings, arguing the number of hours billed by Pena's attorneys on various tasks was unnecessary, duplicative, unreasonable, or inflated. The trial court rejected those claims, and its determinations were well within its discretion. (See *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 447–448 [abuse of discretion].) "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano v. Priest* (1977) 20

16

Cal.3d 25, 49; *Margolin v. Regional Planning Com.* (1982) 134 Cal.App.3d 999, 1007 (*Margolin*).) It is not within our purview to second guess the court's assessments here, which are amply supported by the record. (See *Margolin*, *supra*, 134 Cal.App.3d at p. 1007.)

Central's contention that it was error to apply a multiplier is also meritless. Whether to apply a multiplier to the lodestar figure is within the trial court's discretion. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1134, 1138 (*Ketchum*).) Pena argued for a 2.5 multiplier in light of the contingent risk involved, the successful outcome, the delay in receiving any payment, and to encourage attorneys to undertake similar litigation on a contingent fee basis. The court applied a 1.33 multiplier instead, "having [considered] all the circumstances and facts presented, and the court's intimate knowledge of the case and trial proceedings." That decision was well within its discretion. The use of a multiplier "allows a court awarding attorney fees to include a fee enhancement for the purpose, e.g., of compensating the attorney who agreed to undertake such representation at the risk of nonpayment or delayed payment, in an amount approaching the market rate for comparable legal services." (*Id.* at p. 1136.) Pena's counsel represented her on a contingent basis, worked on her case for four years without receiving any fees, and incurred liability for $38,000 in costs. Moreover, Central informed Pena after the trial that it has virtually no assets amenable to execution in California, and she would find it impossible to collect on the judgment. Therefore, according to Central, "the best [Pena] can hope for" was to settle "in a reasonable amount, with installment payments." We would be hard pressed to find a clearer illustration of *Ketchum*'s observation that " 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.' " (*Id.* at pp. 1132–1133.) This factor makes this case highly appropriate for a multiplier, particularly in light of the very successful outcome obtained by Pena's counsel.

# DISPOSITION

The judgment and the award of attorneys' fees are affirmed.

_____

Siggins, J

We concur:

_____

McGuiness, P.J.

_____

Jenkins, J.